# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-CC-00924-SCT

*CONCERNED CITIZENS TO PROTECT THE ISLES AND POINT, INC., BAY ST. LOUIS COMMUNITY ASSOCIATION AND PRESERVE DIAMONDHEAD QUALITY, INC.*

*v.*

*MISSISSIPPI GAMING COMMISSION AND PINE HILLS DEVELOPMENT PARTNERSHIP d/b/a GOLD STRIKE CASINO AND RESORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/27/1997 |
| TRIAL JUDGE: | HON. JERRY OWEN TERRY, SR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANTS: | REILLY MORSE |
| ATTORNEYS FOR APPELLEES: | FRANK D. MONTAGUE, JR. |
| | JOAN MYERS |
| | M. CAROLE BRAND |
| | JAMES LAWTON ROBERTSON |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 4/15/1999 |

### CONSOLIDATED WITH

### NO. 97-CC-01017-SCT

*BAY ST. LOUIS COMMUNITY ASSOCIATION, PRESERVE DIAMONDHEAD QUALITY, INC., GULF ISLANDS CONSERVANCY, INC., AND CONCERNED CITIZENS TO PROTECT THE ISLES AND POINT, INC.*

*v.*

*MISSISSIPPI COMMISSION ON MARINE RESOURCES AND PINE HILLS DEVELOPMENT PARTNERSHIP d/b/a GOLD STRIKE CASINO AND RESORT*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/97 |
| TRIAL JUDGE: | HON. J. N. RANDALL, JR. |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | REILLY MORSE |
| ATTORNEYS FOR APPELLEES: | FRANK D. MONTAGUE, JR. |
| | JAMES LAWTON ROBERTSON |
| | JOHN R. HENRY, JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | AFFIRMED - 4/15/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 5/6/99 |

**EN BANC.**

**McRAE, JUSTICE, FOR THE COURT:**

¶1. This consolidated appeal arises from a June 27, 1997, order of the Harrison County Circuit Court affirming a site approval granted by the Mississippi Gaming Commission as well as a July 21, 1997 order of the Harrison County Chancery Court affirming the grant of wetlands permits by the Mississippi Commission on Marine Resources, which together provided the necessary approvals for the Pine Hills Development Partnership to build a casino complex on the Bay of St. Louis in Harrison County. Four community groups opposing the development scheme, Bay St. Louis Community Association, Preserve Diamondhead Quality, Inc., Gulf Islands Conservancy, Inc., and Concerned Citizens to Protect the Isles and Point, Inc., now challenge the lower courts' orders affirming the agencies' decisions. Finding that neither agency acted arbitrarily, capriciously or in violation of state law in providing the permits and approvals sought by the developer, we affirm the decisions of the lower courts.

## I.

¶2. Pine Hills Development Partnership long has sought to establish its presence in the Mississippi Gulf Coast's burgeoning casino industry. Its initial plan to site a casino on a manmade inlet dredged from dry land near Interstate 10 in Harrison County, though approved by the Mississippi Gaming Commission, was rejected by this Court in ***Mississippi Casino Operators Ass'n v. Mississippi Gaming Comm'n***, 654 So. 2d 892 (Miss. 1995). On July 18, 1996, after working with the Gaming Commission to find a more suitable location and to develop the most environmentally sensitive of its design options, Pine Hills was granted site approval for its revised plan to build a gaming facility on the north shore of the Bay of St. Louis. Pine Hills also was granted a conditional use adjustment, variance and wetlands permit on July 16, 1996, by the Commission on Marine Resources.

¶3. On August 7, 1996, the Bay St. Louis Community Association, Preserve Diamondhead and Concerned Citizens to Protect the Isles and Point filed a complaint in the Circuit Court of Harrison County, First Judicial District, against the Mississippi Gaming Commission and Pine Hills Development Partners. The complaint charged that the Commission's grant of site approval to Pine Hills was arbitrary and capricious because the depth of the bay at the site was only four feet deep and "regulations require that gaming vessels be located in water with a depth in excess of six (6) feet." Thus, the citizens groups sought a reversal of the Commission's July 18, 1996, decision, or, in the alternative, a remand to the Commission for further consideration.

¶4. In response, Pine Hills asserted that there was no law requiring that waters eligible as a site for a cruise vessel be in excess of six feet in depth prior to any reasonably necessary site improvement work or construction. Pine Hills further responded that the citizens groups had no standing to bring this action since they would suffer no cognizable legal harm and further, since they had not previously raised the arguments now on appeal before the Commission, they neither had preserved the issues for review nor exhausted their administrative remedies.

¶5. On June 27, 1997, the circuit court affirmed the Gaming Commission's decision. The circuit court found that there was no merit to the citizens groups' argument, stating that there is no statutory requirement as to the natural depth of the waters in which a cruise vessel may be located and that Miss. Code Ann. § 27-109-1 (1990) implicitly recognizes that inland gaming sites may require some alteration from their natural state by including language which states that navigable waters must be suitable for docking and mooring a vessel "in their natural or improved condition." Thus, the circuit court found that the fact that Pine Hills would have to make some improvements to the site did not render the Commission's decision arbitrary, capricious or in violation of state law.

¶6. Concurrent with the suit against Pine Hills and the Gaming Commission, the Bay St. Louis Community Association, Preserve Diamondhead, Concerned Citizens to Protect the Isles and Point and Gulf Islands Conservancy filed an action in the Chancery Court of Harrison County, First Judicial District, against Pine Hills and the Commission on Marine Resources on September 18, 1996. The citizens groups appealed the Commission on Marine Resources' grant of a use adjustment and permit on July 16, 1996 to Pine Hills, alleging that the decision was made contrary to staff recommendations made by the Department of Marine Resources. Marine Resources countered that its decision was neither arbitrary nor capricious. In its separate answer, Pine Hills argued that the appeal was time barred because it was made more than thirty days after the permit was initially mailed. Pine Hills further asserted that the findings of the Department of Marine Resources staff were based on "an unreasonably and impermissibly high level of speculation and conjecture," and that those findings were not binding on the Commission. In his July 21, 1997 Memorandum Opinion and Order, affirming the orders of the Commission on Marine Resources, the chancellor found that the public good would be served by the project and that the decision was consistent with public policy, that the Commission had placed proper and reasonable protective conditions and provisions on the permits granted so as to protect the wetlands environment and that the citizens group had failed to demonstrate that the Commissions' actions were arbitrary, capricious or in violation of any statutory or constitutional rights.

¶7. Aggrieved first by the circuit court's order affirming the site approval granted by the Mississippi Gaming Commission, the Bay St. Louis Community Association, Preserve Diamondhead and Concerned Citizens to Protect the Isles and Point now appeal to this Court, asserting, in Cause No. 97-CC-00925-SCT, that:

**I. THE MISSISSIPPI GAMING COMMISSION ERRED IN DECIDING THAT UP TO 50% OF PINE HILLS DEVELOPMENT PARTNERSHIP'S CASINO CRUISE VESSEL MAY LAWFULLY BE LOCATED ON LAND ABOVE MEAN HIGH TIDE, AND ERRED IN APPROVING PINE HILL'S SITE PROPOSAL.**

**II. THE MISSISSIPPI GAMING COMMISSION ERRED IN DECIDING THAT PINE HILLS DEVELOPMENT PARTNERSHIP COULD LAWFULLY LOCATE A CASINO IN WATERS LESS THAN SIX FEET DEEP IN THEIR NATURAL STATE.**

**III. NEITHER UNTESTED ADMINISTRATIVE DETERMINATIONS ON OTHER CASINO SITES OR CLAIMS OF A LANDOWNER'S RIGHT TO CONDUCT DOCKSIDE GAMING SUPPORT MGC'S ACTION.**

¶8. Also aggrieved by the chancellor's finding that the Commission on Marine Resources correctly granted Pine Hills the wetland permits it needed to pursue the casino project, the Bay St. Louis Community Association, Preserve Diamondhead, Concerned Citizens to Protect the Isles and Point and Gulf Islands

Conservancy further assert, in Cause No. 97-CC-01017-SCT, that:

**I. THE COMMISSION ON MARINE RESOURCES INCORRECTLY FOUND THAT THE ENACTMENT OF THE MISSISSIPPI GAMING CONTROL ACT WORKED A CHANGE IN THE CHARACTER OF THE AREA THAT WOULD JUSTIFY REZONING THE SITE UNDER THE "CHANGE OR MISTAKE" DOCTRINE;**

**II. THE COMMISSION ON MARINE RESOURCES REJECTED ITS EXPERT STAFF FINDINGS AND RECOMMENDATIONS AGAINST THIS PROJECT WITHOUT SUFFICIENT FACTUAL FINDINGS FOR ITS CONCLUSIONS, AND ITS ACTION WAS ARBITRARY AND CAPRICIOUS; AND**

**III. THE COMMISSION ON MARINE RESOURCES DENIED APPELLANTS OF DUE PROCESS OF LAW.**

## II.

¶9. Pine Hills Development Partnership d/b/a Gold Strike Casino and Resort seeks to build a destination resort and casino on the Mississippi Gulf Coast. The proposal includes a thirty-story, fourteen-hundred room hotel, a five-story parking garage and thirty-eight hundred car parking lot, a seven-hundred foot long fishing pier, and a moored gaming vessel. The gaming vessel, itself, would consist of five interconnected barges, covering an area of some three hundred by five hundred square feet, or almost 3.4 acres.

¶10. The site selected by Pine Hills is located on the north shore of the Bay of St. Louis, approximately one-half mile east of the Hancock-Harrison County line in Harrison County. Pine Hills' application for preliminary approval of the site by the Mississippi Gaming Commission was granted on May 16, 1996. It was conditioned upon location of at least fifty percent of the cruise vessel below mean high tide and the granting of permits by the Department of Marine Resources and the Department of Environmental Quality.

¶11. The shore line along which Pine Hills seeks to develop its casino project presently is undeveloped. It is located within a coastal wetlands area which is considered to be a potential coastal reserve and eligible for registration/dedication by the National Heritage Law of 1973 as determined by the Commission on Wildlife, Fisheries and Parks in 1994. Pursuant to the Mississippi Coastal Program's[1] Wetland Use Plan, the project site is located within an existing General Use "G" district. The Coastal Program defines general use areas as "wetland areas where only minor alterations are allowed when such alterations do not adversely affect recreation, swimming, fishing and the natural scenic qualities of the wetlands." The designation provides that:

> Allowable uses or activities are the construction of piers, docks, bulkheads; other similar structures, submarine cables and pipelines; launching ramps; oyster farming, transportation facilities developed under a plan reviewed and found to be consistent under the policy co-ordination procedures in Section 4; overhead transmission lines; beach nourishment activities; reasonable dredging and filling necessary to accommodate the above uses; and dredging of sand and gravel.

¶12. The plan proposed by Pine Hills includes the construction of a low water sediment control structure or basin in which to float the gaming vessel so as to insure its flotation when waters are low. Construction of the basin further would involve the installation of twelve-hundred-fifty feet of steel sheet piling around the perimeter of the barges, as well as the installation of a four-hundred-fifty foot sheet pile bulkhead along the

shoreline. To accommodate the gaming vessel, a three-hundred-twenty by five-hundred-twenty square foot area along the shoreline would have to be mechanically dredged. Some thirty-two-hundred cubic yards of material would be removed to create a bottom elevation of seven feet below mean low water. The water in the casino basin would be mixed and aerated by two variable speed turbine pumps.

¶13. Because of the nature of the project, the report of the staff of the Department of Marine Resources, while expressly not endorsing the project, recommended that Pine Hills seek an adjustment in the site designation as a conditional Water Dependent Industry ("I") area. The Coastal Program defines this designation as encompassing those areas which "may be used for activities associated with water dependent industrial development." Pursuant to the "I" designation,

> Allowable uses or activities in an industrial development district are the construction of piers, docks, wharfs, dolphins, bulkheads, skids, marine launch ways, dry docks, graving docks, launching ramps, hoists, cranes, submarine cables or pipelines, water intake or effluent discharge structures, other similar structures necessary for water dependent industrial development as well as dredging filling necessary for water dependent development. Uses allowed in "C" and "G" districts are also allowable.

¶14. The "C" designation to which the definition refers covers Commercial Fishing and Recreational Marinas, "areas designated to accommodate developments necessary to support commercial fishing or recreational marinas and associated activities."

¶15. Pine Hills filed its joint application and notification with the Department of Marine Resources and U.S. Army Corps of Engineers on May 28, 1996. Subsequent amendments to the application were filed in June and July of 1996. Pine Hills' application for a use adjustment, variance and wetlands permit was granted on July 16, 1996, by the Commission on Marine Resources. A Department of the Army permit was approved on September 26, 1997. Pine Hills' plan also was approved by the Commission on Environmental Quality, which decision was appealed to the Chancery Court of Harrison County by the citizens groups in ***Protect Diamondhead Quality, Inc., Bay St. Louis Community Association, Concerned Citizens to Protect The Isles And Point, Inc., and Gulf Islands Conservancy, Inc. v. Commission on Environmental Quality, Pine Hills Development Partnership and Circus Circus, Inc.***, No. C2401-97-01527. As an appellate court, when reviewing the agency's decision, we are limited in our review. Finding that the agency's decision was supported by substantial evidence in the record and that the citizens groups had not demonstrated that the Commission acted arbitrarily, capriciously or in violation of any statutory or constitutional right, the chancellor affirmed the agency order on February 23, 1998.

### III.

¶16. This Court affords great deference to an administrative agency's construction of its own regulations. *Mississippi Gaming Comm'n v. Board of Educ.*, 691 So. 2d 452, 455 (Miss. 1997); ***Mississippi Dep't of Envtl. Quality v. Weems***, 653 So. 2d 266, 273 (Miss.1995). This deference will be of "no material force where the agency action is contrary to the statutory language." ***Casino Magic Corp. v. Ladner***, 666 So. 2d 452, 459 (Miss.1995)(***quoting Gill v. Mississippi Dep't of Wildlife Conservation***, 574 So. 2d 586, 593 (Miss.1990)). A Commission order may be reversed if the petitioner's rights were prejudiced because the decision was "(a) [i]n violation of constitutional provisions; (b) [i]n excess of statutory authority or jurisdiction of the commission; (c) [m]ade upon unlawful procedure; (d) [u]nsupported by any evidence; or (e) [a]rbitrary or capricious or otherwise not in accordance with law." Miss. Code Ann. § 75-76-125(3) (1991). A decision of the Commission on Marine Resources,

similarly, shall be affirmed if it is "supported by substantial evidence, consistent with the public policy set forth in this chapter, is not arbitrary or capricious and does not violate constitutional rights. . . ." Miss. Code Ann. § 49-27-39(b) (1973).

## IV.

### A. THE MISSISSIPPI GAMING COMMISSION DECISION

### I. WHETHER THE MISSISSIPPI GAMING COMMISSION ERRED IN DECIDING THAT UP TO 50% OF PINE HILLS DEVELOPMENT PARTNERSHIP'S CASINO CRUISE VESSEL MAY LAWFULLY BE LOCATED ON LAND ABOVE MEAN HIGH TIDE, AND ERRED IN APPROVING PINE HILL'S SITE PROPOSAL

¶17. The Gaming Commission's preliminary recommendation and ultimate approval of the Pine Hills site was predicated, in part, upon the location of at least fifty percent of the cruise vessel below mean high tide. The citizens groups now assert that the Commission's approval was contrary to statutory language, alleging that it allowed Pine Hills to place a cruise vessel on a site that was twenty percent on land above mean high tide. Despite the citizens groups' vigorous letter-writing campaigns, the record gives no indication that the groups ever objected to any specific aspects of the Commission's findings or raised the issues before the Commission. Thus, Pine Hills argues, as it did in the proceedings below, the issues now raised were not preserved at the administrative level and are barred from review. *See United Cement Co. v. Safe Air for the Env't, Inc.*, 558 So. 2d 840, 843 (Miss. 1990).

¶18. Their failure to raise the issue before the Commission notwithstanding, the citizens groups' argument is predicated upon language of this Court taken out of context from the successful challenge to Pine Hills' first approved development plan in *Mississippi Casino Operators Ass'n v. Mississippi Gaming Comm'n*, 654 So. 2d 892 (Miss. 1995). In that case, this Court struck down the Gaming Commission's approval of Pine Hills' original plan to locate a gaming vessel on a man-made inlet and protected cove as contradictory to the Gaming Commission's own Regulation No. 2. *Casino Operators,* 654 So. 2d at 894. Regulation No. 2 provides as follows for the location of cruise vessels in:

> Waters within the State of Mississippi which lie adjacent to the three (3) most southern counties of the State. In addition to the Mississippi Sound, this would include St. Louis Bay, Biloxi Bay, and Pascagoula Bay. However, the rivers and bayous leading into these bays, including but not limited to Jourdan River, Wolf River, Bernard Bayou, Tchoutacabouffa River, Pascagoula River and Escapatawpa [sic] are not within the authorized area. In determining where the river ends and the bay begins, an imaginary line shall be drawn from the foremost land mass at the intersection of the river and bay, straight across the river to the foremost land mass of the intersection on the other side.

*Id.* The site plan approved by the Commission "proposed to divert waters from the Bay of St. Louis *northward* through to man-made channels 45 to 65 feet wide, running a quarter of a mile inland to an artificial cove carved out of dry land in Harrison County." *Id.* at 893 (emphasis added). We found that the proposed artificial inlets were no different than those naturally occurring inlets emptying into the bay. *Id.* Thus, the Court further found that Regulation No. 2's limitation of permissible gaming sites to the Mississippi Sound, St. Louis Bay, Pascagoula Bay and the Biloxi Bay was a reasonable interpretation of Miss. Code Ann. § 97-33-1(a) and (b) (1994), which exempt from penalty those gambling activities that take place on

cruise vessels in waters "which lie adjacent to the State of Mississippi *south* of the three (3) most southern counties in the State of Mississippi," as well as on the Mississippi River. *Id.* and § 97-33-1(a) (emphasis added). In so finding, we stated,

> Here, the proposed site approved by the Commission is clearly not within any of these areas. Moreover, if anything is clear in the statute, an approved site must be on water. The site here in question is not on water. It is on land which the applicants propose to dredge.

*Casino Operators*, 654 So. 2d at 895. It is from this context that the citizens groups derive their argument that we have applied a *de minimis* rule to the statutory definitions of where a gaming vessel may be located, stating that "[a] site which is 20% on land is not 'on water' and *MCOA* says that dredging cannot be used to fix it." Nothing in the applicable statutes, in *Casino Operators*, or any of this Court's other decisions, however, can be properly construed as so requiring.

### II. WHETHER THE MISSISSIPPI GAMING COMMISSION ERRED IN DECIDING THAT PINE HILLS DEVELOPMENT PARTNERSHIP COULD LAWFULLY LOCATE A CASINO IN WATERS LESS THAN SIX FEET DEEP IN THEIR NATURAL STATE.

¶19. Next, the citizens groups contend that the Commission's site approval was faulty because "waters in their natural, unimproved condition must be capable of accommodating a cruise vessel with a six foot draft." In support of their argument, the citizens groups rely on the requirements set forth in Miss. Code Ann. § 27-109-1(2) (1990) and Miss. Code Ann. § 97-33-7(4)(a) and (b) (1994). Section 27-109-1(2) provides the definitions upon which the assignment of error is premised:

> For purposes of this chapter, the term "cruise vessel" shall mean a vessel which complies with all U.S. Coast Guard regulations, having a minimum overall length of one hundred fifty (150) feet and a minimum draft of six (6) feet and which is certified to carry at least two hundred (200) passengers; and the term "vessel" shall mean a vessel having a minimum overall length of one hundred fifty (150) feet. The term "vessel" shall also mean a "cruise vessel" as referred to in Section 27-109-11. For the purposes of a "vessel" as that term is defined in this section, "navigable waters" means any rivers, creeks, bayous or other bodies of water within any county in this state bordering on the Mississippi River that are used or susceptible of being used as an artery of commerce and which either in their natural or improved condition are used or suitable for use as an artery of commerce or are used for the docking or mooring of a vessel, notwithstanding interruptions between the navigable parts of such rivers, creeks, bayous or other bodies of water by falls, shallows, or rapids compelling land carriage.

¶20. Providing additional definition to those waters in the Gulf and along the Mississippi River in which gaming vessels may be located, § 97-33-7(4)(a) and (b)[(2)] state:

> (4) Notwithstanding any provision of this section to the contrary, it shall not be unlawful to operate any equipment or device described in subsection (1) of this section or any gaming, gambling or similar device or devices by whatever name called while:

> (a) On a cruise vessel as defined in Section 27-109-1 whenever such vessel is in the waters within the State of Mississippi, which lie adjacent to the State of Mississippi south of the three (3) most southern counties in the State of Mississippi, and in which the registered voters of the county in which the port is located have not voted to prohibit such betting, gaming or wagering on cruise vessels as provided in

Section 19-3-79;

(b) On a vessel as defined in Section 27-109-1 whenever such vessel is on the Mississippi River or navigable waters within any county bordering on the Mississippi River, and in which the registered voters of the county in which the port is located have not voted to prohibit such betting, gaming or wagering on vessels as provided in Section 19-3-79; . . .

It is upon § 27-109-1(2), however, which the community groups primarily appear to rely in asserting that coastal waters, in their natural state, must be capable of supporting a vessel with a six-foot draft. As Pine Hills points out, however, the six-foot draft requirement falls within that section of the code provision which defines "vessel," not in the clause defining "navigable waters." While the circuit court noted in its opinion that the phrase defining "navigable waters" as being "in their natural or improved condition" implied that dredging was permissible, the citizens groups turn to the distinction made in §§ 97-33-7(4)(a) and (b) between "waters" south of the three most southern counties and "navigable waters" on the Mississippi River to refute that premise, arguing, without any authority, that the modifier "navigable" broadens the meaning of waters to include those which have been improved, and thus "[i]t follows that the waters in their natural, unimproved condition must be capable of accommodating a cruise vessel with a six foot draft." To the contrary, the absence of the modifier "navigable" could just as well be construed as enlarging the scope of waters to embrace any "waters," regardless of whether they are navigable. We further note that in Marine Resources' Coastal Program, both the General Use "G" designation assigned to the site and the Water Dependent Industry "I" designation to which it was changed pursuant to Pine Hills' request allow for reasonable dredging and filling of sites to accommodate the uses permitted within each designation. This, in and of itself, would tend to negate the groups' contention that the waters must be in their natural state or that dredging is impermissible.

¶21. The citizens groups' argument also ignores the fact that the apparent ambiguities in §§ 97-33-7(4)(a) and (b) have been addressed by this Court as well as by the Gaming Commission. In *Casino Operators*, where we found that the Commission had exceeded its authority by approving Pine Hills' earlier proposal to construct an artificial inlet north of the Bay of St. Louis upon which to float a gaming vessel, we addressed the failure of § 97-33-1(a) to define specifically "waters within the State of Mississippi, which lie adjacent to the State of Mississippi south of the three (3) most southern counties." There, we noted that "unlike the provisions regarding gaming on the Mississippi River, the Gulf Coast gaming provision does not expressly state that gaming is allowed on all 'navigable waters' within the counties which border on the Gulf of Mexico." *Casino Operators*, 654 So. 2d at 894. The Gaming Commission's Regulation No. 2, providing further definition to the statutory language, thus was found to be "a reasonable interpretation of the statute." *Id.* at 894-95. The deciding factor is not the depth of the waters in their "unimproved" state as the citizens groups would argue; rather it is where the waters are located.[3]

### III. WHETHER NEITHER UNTESTED ADMINISTRATIVE DETERMINATIONS ON OTHER CASINO SITES OR CLAIMS OF A LANDOWNER'S RIGHT TO CONDUCT DOCKSIDE GAMING SUPPORT MGC'S ACTION

¶22. In passing, and again relying on our decision in *Casino Operators*, the citizens groups urge this Court to disregard that part of the record which includes administrative orders regarding site modifications made by other casinos since "'[n]one of the orders granting these licenses were appealed and they are not presently before us.'" *Casino Operators*, 654 So. 2d at 895. Specifically, they appear to object to

documents which form the basis of footnote 10 of Pine Hills' brief. In that footnote, Pine Hills prepared a chart indicating the site improvement dredging of casino sites as reflected in public notices issued by the U.S. Army Corps of Engineers. However, that footnote expressly states:

> We do not cite these as judicially binding precedents but as evidence of a widespread custom and practice which suggests the reading Appellants would give the statutes would create substantial design and engineering difficulties without countervailing enhancement in legality or the public benefit. For the moment, we ask the Court to consider that any inadequacy of the Record on this point is a function of the fact that no one had any idea Appellants would appear and press the present points until the Record was closed.

¶23. They further suggest that should Pine Hills argue that it has a right "to conduct a gaming operation if it meets the criteria for eligibility," it is wrong because there is no such right. As they assert, Miss Code Ann. § 75-76-3(5) "explicitly does not grant anyone a vested right to gaming on their property." *Casino Magic Corp. v. Ladner*, 666 So. 2d 452, 458 (Miss. 1995). Pine Hills, however, makes no such argument. That notwithstanding, Miss. Code Ann. § 75-76-7 provides the Commission with the authority "to determine the locations of casinos which wish to build in the Gulf Coast area." *Casino Operators,* 654 So. 2d at 894. In considering Pine Hills' site application, which the citizens groups now appeal, the Gaming Commission was merely acting pursuant to its statutory mandate.

## B. THE COMMISSION ON MARINE RESOURCES DECISION

### I. WHETHER THE COMMISSION ON MARINE RESOURCES INCORRECTLY FOUND THAT THE ENACTMENT OF THE MISSISSIPPI GAMING CONTROL ACT WORKED A CHANGE IN THE CHARACTER OF THE AREA THAT WOULD JUSTIFY REZONING THE SITE UNDER THE "CHANGE OR MISTAKE" DOCTRINE

¶24. Pine Hills sought and received an adjustment to the Mississippi Coastal Program's wetland use plan, allowing the site designation to be changed from a General Use "G" district to a conditional Water Dependent Industry "I" designation. The Coastal Program's wetland use plan, last updated in 1988, makes no provision for casino development. The DMR staff recommendation, although expressly refusing to endorse Pine Hills' proposal, had advised that the developer seek a conditional "I" designation, stating that "[c]onditional considerations would allow for an 'I' designation for the life of the project or until the MCP would be revised to reflect a 'Casino' district."

¶25. The citizens groups first contend that the chancellor and the Marine Resources Commission erred in not applying the "change or mistake" rule of municipal zoning to the decision in allowing a change in the Coastal Wetlands Use Plan to accommodate Pine Hills' casino development plan. In response, Pine Hills argues that municipal zoning law is inapplicable. The Marine Resources Commission, in defense of its decision, further asserts that municipal zoning law has not been identified by the State as applicable to the Mississippi Coastal Program, rather, it has been limited to matters of local government zoning; that the Program has its own set of decision factors which are considered when balancing the often competing interests of wetlands preservation and public trust land use which would be confounded by the judicial application of the "change or mistake" rule; and the Commission would have violated its own regulations had it determined that municipal zoning rules were part of the Mississippi Coastal Program.

¶26. The Mississippi Coastal Progam provides its own detailed factors to consider in determining whether a requested adjustment to the wetlands use plan should be allowed. According to the Coastal Program, whether a change may be made is within the discretion of the Mississippi Commission on Wildlife Conservation, based on the findings and recommendations of its subdivisions, the Bureau of Marine Resources and the Department of Wildlife Conservation. Approval of a proposed adjustment, actually given by the appropriate subdivision, must be made on one or more of the following criteria:

i. No significant environmental impacts would occur as a result of the use allowed, no feasible, alternative sites in the use designation being requested are available, the general public as well as governmental entities were notified of the activity, no significant conflicts with surrounding uses or public access to coastal wetlands would occur and the activity does not adversely affect the public interest in wetlands protection;

ii. There is a significant public benefit in the activity, impacts to public access and adverse environmental impacts have been minimized, and the general public as well as governmental entities were notified of the project, and a public hearing was held; or

iii. The adjustment would be temporary in order to allow a temporary activity in the public interest with the adjustment occurring in a prescribed period set by MCWC at the end of which the area would revert to the original use designation.

¶27. The "change or mistake" rule of municipal zoning is based on the presumption that "'the original zoning is well planned and designed to be permanent." *Board of Aldermen v. Conerly*, 509 So. 2d 877, 883 (Miss. 1987)(*quoting Martinson v. City of Jackson*, 215 So. 2d 414, 417 (Miss. 1968)). Thus, before a zoning board reclassifies property from one zoning classification to another, "there must be proof either (1) that there was a mistake in the original zoning, or (2) that the character of the neighborhood has changed to such an extent as to justify reclassification, *and* that there was a public need for rezoning." *Conerly*, 509 So. 2d at 883 (footnote omitted) (emphasis in original). Nothing in Miss. Code Ann. §§ 17-1-1 to -39 (1995 & Supp. 1998), which govern zoning, land use and subdivision regulation, local government provisions that are common to counties and municipalities, suggests that principles of municipal zoning should be applicable outside this specific context.

¶28. There also is a presumption that zones established pursuant to municipal zoning ordinances "are well-planned and designed to be permanent." *Martinson,* 215 So. 2d at 417 (citation omitted). In contrast, the wetlands use plan was designed as a flexible tool for the general management of the State's coastal wetland areas in keeping with the policies favoring the preservation of natural wetlands except where a specific alteration of the area would serve a higher public interest and allowing for reasonable industrial expansion of the waterfront and efficient utilization of waterfront industrial sites so that suitable sites are conserved for water dependent industries. Miss. Code Ann. §§ 49-27-3 (1990) and 57-15-6(1)(a). Thus, the goals of municipal zoning and the wetlands use plan may not be as compatible as the citizens groups urge.

¶29. Nevertheless, the citizens groups rely on a 1996 report to the Mississippi Department of Marine Resources, McLaughlin and Hess, "Casino Gaming on Public Waters: A Summary of Laws and Policies Governing Casino Development in Mississippi's Coastal Zone and Recommendations for Their Improvement" to support their contention that the Commission should have employed the change or mistake doctrine. The McLaughlin/Hess report recommends that the Coastal Use Program be amended to require a showing of change or mistake before making adjustments to the use plan. However, the citizens groups, in

advocating their position that the Commission should have employed the rule in considering Pine Hills' permits, overlook two points. First, the report clearly states:

> Finally, there is no reason that all adjustments to use designations in the coastal program have to meet the "mistake or change in circumstances" test. In those instances where the adjustment pertains either to an undeveloped coastal area or a use zone located entirely seaward of the coast, a court would probably find less need to apply the test. Under such circumstances, there would be no neighbors to protect. However, this exception would clearly not apply when the adjustment allows formerly prohibited uses in developed coastal areas.

The area in question is an undeveloped area and the part of the proposed development project in question, for all practical purposes (that is, except for the hotel and parking lots), is entirely seaward from the coast. Moreover, even though gaming is a new use of the area, the specific activities for which the permits are sought, including construction of piers, docks and moorings, and reasonable dredging and filling to accommodate those uses, are permissible under the General Use "G" designation previously assigned to the site at issue. Thus, even following the recommendation of the 1996 report, the change or mistake rule would not be applicable to the Pine Hills site. Moreover, Mississippi and Maryland are among the very few jurisdictions which follow the change or mistake doctrine. *See **Palermo Land Co. v. Planning Comm'n***, 561 So. 2d 482, 489 (La. 1990)(again refusing to adopt the "change or mistake" rule, the Louisiana Supreme Court noted that it had been rejected in the majority of jurisdictions which have considered it). Thus, given the interplay between state and federal law inherent in the coastal zone management program, we cannot extend the rule to govern critical policy making which requires the co-operation of a panoply of federal and state regulatory agencies.

### II. WHETHER THE COMMISSION ON MARINE RESOURCES REJECTED ITS EXPERT STAFF FINDINGS AND RECOMMENDATIONS AGAINST THIS PROJECT WITHOUT SUFFICIENT FACTUAL FINDINGS FOR ITS CONCLUSIONS, AND ITS ACTION WAS ARBITRARY AND CAPRICIOUS

¶30. Citing Marine Resources staff concerns about the impact of the project on the wetlands ecology, and alleging availability of alternative sites, public opposition to the plan, conflicts with surrounding land uses and adverse effects upon public interest in wetlands protection, the citizens groups next assert that the Commission's decision to grant a use adjustment changing the site in question from "G," general use area, to "I," industrial use area, was unsupported by any substantive findings on the agency's decision criteria, and thus was arbitrary and capricious.

¶31. The Bureau of Marine Resources staff opinion acknowledged that:

> To date, the DMR has not recommended any use plan adjustments for casino developments in a "G" district. Nonetheless, 20 permits have been issued by the DMR authorizing casino development within the scope of the existing Mississippi Coastal Program. The public interest related to casino development on the coast has been and continues to be served by this Department and the MCP.

Concerns raised by the staff about future development in the area, secondary use development and environmental impact were raised also by the citizens groups in their appeal. The competing, albeit not necessarily incompatible, economic and environmental interests of coastal development form the basis of the controversy between the citizens groups and Pine Hills. Grant of the permits to Pine Hills was contingent

upon the satisfaction of a variety of mitigating conditions and provisions, which the chancellor found were reasonably designed to protect the wetlands and other environmental interests.

> "Arbitrary" means fixed or done capriciously or at pleasure. An act is arbitrary when it is done without adequately determining principle; not done according to reason or judgment, but depending upon the will alone,-- absolute in power, tyrannical, despotic, nonrational,--implying either lack of understanding of or disregard for the fundamental things.

> "Capricious" means freakish, fickle, or arbitrary. An act is capricious when it is done without reason, in a whimsical manner, implying either a lack of understanding or of a disregard for the surrounding facts and settled controlling principles .... [citation omitted].

*McGowan v. Mississippi State Oil & Gas Bd.*, 604 So. 2d 312, 322 (Miss. 1992) (*quoting Mississippi State Dep't of Health v. Southwest Miss. Regional Medical Center*, 580 So. 2d 1238, 1240 (Miss. 1991)). Given the deference this Court affords agencies in interpreting their own regulations, we do not find that the Commission on Marine Resources, which has followed closely its own regulations and worked in conjunction with other state agencies in granting the conditional use adjustment and permits necessary for Pine Hills to move forward with its development plan, acted arbitrarily or capriciously.

### III. WHETHER THE COMMISSION ON MARINE RESOURCES DENIED APPELLANTS OF DUE PROCESS OF LAW

¶32. In their final assignment of error, relying on *Thrash v. Mayor of Jackson*, 498 So. 2d 801 (Miss. 1986), the citizens groups assert that they were denied due process of law by the Commission's failure to allow them to address their concerns at the August 20, 1996, meeting where their petition for reconsideration was denied. As the record amply documents, public notice has been provided at every step of the process and the citizens groups actively participated in the Commission's proceedings through their letter writing campaigns, their various written complaints and their appearances at public meetings. Further, neither in the record nor in the citizens groups' brief is there any suggestion of what witnesses or testimony they might have presented at the meeting. In *Thrash*, where we found that opponents to a rezoning decision had received ample notice of all proceedings and an opportunity to be heard, it was noted, as in the case *sub judice*, that no logical argument or authority in support thereof had been presented to support their due process argument. *Id.* at 807. Further, provisions of the Coastal Program governing the reconsideration and appeal of permit decisions state that when such a request is considered, the Commission "*may* secure any additional information it deems necessary, either through DWC/BMR *or through testimony from interested parties*." From the argument presented, we cannot say that any alleged due process rights of the citizens groups were violated.

### V.

¶33. The Gaming Commission's decision to grant a site approval to Pine Hills Development Partnership for a casino location on the northern shore of the Bay of St. Louis is neither violative of any constitutional provisions nor in excess of the Commission's statutory authority nor based on any unlawful procedure. Further, the decision cannot be said to be unsupported by the evidence, arbitrary, capricious or otherwise not in accordance with law. To the contrary, there is no basis for the citizens groups' contentions that gaming vessels may not be located on any sites which require dredging or other site preparation work to accommodate the vessel. We affirm the circuit court's order affirming the site approval given by the Gaming

Commission.

¶34. There further is no basis for the citizens groups' assertion that the Bureau of Natural Resources should use the "change or mistake" doctrine of municipal zoning when considering requested use adjustments to the Mississippi Coastal Program wetlands use plan. Further, while we respect the staff concerns about whether the conditional use adjustment should be granted, the ultimate decision is within the discretion of the Bureau of Marine Resources. The citizens groups have not demonstrated that the decision was arbitrary, capricious, inconsistent with public policy or unsupported by substantial evidence. Therefore, the chancellor's order affirming the decision of the Bureau of Marine Resources is affirmed.

¶35. **JUDGMENT IS AFFIRMED.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, SMITH AND WALLER, JJ., CONCUR. MILLS AND COBB, JJ., NOT PARTICIPATING.**

1. The Coastal Program, authorized by Miss. Code Ann. § 57-15-6 (1996), is managed by the Bureau of Marine Resources, the Bureaus of Pollution Control and Land and Water Resources (both part of the Department of Natural Resources) and the Department of Archives and History. The Program "blueprint," "Mississippi Coastal Program," prepared by the Bureau of Marine Resources/Department of Wildlife Conservation in 1980 and revised in 1988, which outlines the rules, regulations, policies and procedures for management and development of the State's coastal waters, is cited extensively herein as Coastal Program.

2. The same definitions are provided in Miss. Code Ann. § 97-33-1(a) and (b), which exempt from the prohibition against betting, gaming and wagering those gambling activities which take place on gaming vessels located in the Gulf or along the Mississippi River.

3. If depth were the determining factor, the entire shoreline of the area defined by Regulation No. 2 has an average depth of two feet, as illustrated by the nautical chart of the Intercoastal Waterway from Dog Key Pass to Waveland submitted as an exhibit by Pine Hills, thus precluding the mooring of any "vessel" complying with the statutory guidelines along the shore.