**FRIENDS OF THE EARTH, INC., *et al.*, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, Defendant.**

Friends of the Earth, Inc., *et al.*, Plaintiffs,

v.

United States Army Corps of Engineers, Defendant.

Friends of the Earth, Inc., *et al.*, Plaintiffs,

v.

United States of Army Corps of Engineers, Defendant.

Nos. CIV. A. 98–0801, 98–1699 and 98–2439.

United States District Court, District of Columbia.

Aug. 10, 2000.

William J. White, Earth Justice Legal Defense Fund, Washington, DC, Natalie M. Walker, Carries Esther Boykin, Earth Justice Legal Defense Fund, New Orleans, LA, for Friends of the Earth, Inc.

Cherie L. Rogers, Ann D. Navaro, U.S. Dept. of Justice, Environment & Natural

Resources Division, Washington, DC, for United States Army Corps of Engineers.

*OPINION*

PAUL L. FRIEDMAN, District Judge.

When it passed the National Environmental Policy Act of 1969 ("NEPA"), Congress declared a "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). "The sweeping policy goals announced in § 101 of NEPA are ... realized through a set of 'action-forcing' procedures that require that agencies take a 'hard look at environmental consequences.'" *Id.* at 350, 109 S.Ct. 1835 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). In particular, NEPA requires a federal agency to assess the potential environmental impacts of any "major federal action" prior to going forward. *See* 42 U.S.C. § 4332. The "twin aims" of this requirement are to "place upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action" and to "inform the public that [the agency] has indeed considered environmental concerns in its decisionmaking process." *Baltimore Gas & Electric Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983) (citations omitted).

Plaintiffs bring these lawsuits because they claim that defendant, the United States Army Corps of Engineers (the "Corps"), did not further the twin aims of NEPA when it determined that NEPA did not require an environmental impact statement ("EIS") prior to the permitting of three casinos on the Mississippi coast. In particular, plaintiffs maintain that the Corps failed to consider a range of direct environmental impacts, indirect impacts,

and cumulative impacts of the projects when it found that the three casino projects would have no significant impacts on the environment that would require evaluation through an EIS. After careful consideration of the parties' cross-motions for summary judgment, the submissions of defendant-intervenors, the administrative records and the arguments of counsel at the May 19, 2000 motions hearing in these matters, the Court concludes that the Corps failed to consider adequately a number of the potential impacts of the three projects and that an EIS was required for all three projects.[1] The Court therefore will grant plaintiffs' motion for summary judgment.

## I. BACKGROUND

By virtue of a strange quirk of Mississippi law, gambling establishments in Mississippi may only be built on floating vessels. *See* MISS.CODE ANN. § 97–33–1(a); MISS.CODE ANN. § 27–109–1. As a consequence, over twenty casinos have been permitted, and at least fourteen have been built, on large floating barges along the Mississippi coast in the past decade. The most recent projects to move forward are the three casinos at issue in these cases: the Casino World casino; the Circus Circus casino; and the Royal D'Iberville casino. The Casino World and Circus Circus projects are proposed to be built on the relatively undeveloped coast of the St. Louis Bay, while the Royal D'Iberville project is proposed for the more developed Bay of Biloxi.

Because of their location, all three proposed casinos would have an impact on navigable waters. The casino developers therefore were required to apply to the Corps for a permit under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors

---

1. The intervenors in these cases are Casino World, Inc., the Mississippi Gaming Corporation, the Pine Hills Development Partnership, and Royal D'Iberville Development, Inc., all on behalf of defendant.

Act. *See* 33 U.S.C. § 403.[2] Under NEPA, the granting of such permits may constitute "major federal actions significantly affecting the quality of the human environment" that require the Corps to conduct an EIS. 42 U.S.C. § 4332(C). In order to determine whether the granting of each of the casino permits was a "major federal action," the Corps undertook an environmental assessment ("EA") for each project. *See* 40 C.F.R. § 1501.4(b). In each case, the Corps made a "finding of no significant impact" ("FONSI") and therefore determined that no EIS was required. *See* Casino World Administrative Record ("CWAR") at 1087–1134; Circus Circus Administrative Record ("CCAR") at 2385–2440; Royal D'Iberville Administrative Record ("RDAR") at 299–335.

### A. Casino World

The Corps' evaluation of the Casino World project began with the Hancock County Port and Harbor Commission's submission of an application for the necessary permit in May of 1996. CWAR at 8.[3] The permit application described a casino development that included the mooring of two 600 foot long casino barges, a floating gazebo that is 150 feet in diameter, and an elevated access road to the barges and gazebo. CWAR at 31. The casino barges, gazebo and road would cover about 4.8 acres of water bottom. CWAR at 31. The proposed casino development also includes a 450–room hotel, a 2000–seat entertainment facility, a tennis court complex, a parking garage, a golf course and a recreational vehicle park to be built on the uplands adjacent to the moored casino. CWAR at 31.

On June 14, 1996, the Corps issued a Public Notice of the Casino World application. Over the next two years, the Corps received numerous comments, including comments from the U.S. Environmental

Protection Agency ("EPA"), the Fish and Wildlife Service ("FWS"), the National Marine Fisheries Service ("NMFS"), and the Mississippi Department of Marine Resource ("MDMR"), all suggesting that the Corps prepare an EIS. These agencies all expressed concern regarding the potential environmental impacts of the Casino World development, including the potential impacts on water quality and habitat, the secondary impacts of the upland development, and the cumulative impacts of the numerous casino projects along the coast. *See* CWAR 540–42; 612–13; 616; 641–46; 818–21. The Corps disagreed with these comments and issued its EA and FONSI on March 3, 1998. The permit was issued on March 25, 1998. *See* CWAR 119.

### B. Circus Circus

As proposed, the Circus Circus casino would be located just to the east of the Casino World project on the St. Louis Bay. The Pine Hills Development Partnership, the organization hoping to develop the Circus Circus site, applied for a permit under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act in May of 1996. The Circus Circus proposal encompasses a floating casino with dimensions of approximately 300 feet by 500 feet along with numerous landside facilities, including a conference center, theaters, food and beverage courts, entertainment facilities, a pedestrian rotunda, a hotel and surface and structured parking. *See* CCAR at 298.

Once again, the Corps issued a Public Notice respecting the Circus Circus application on June 12, 1996. Once again, the Corps received extensive comments, including comments from the EPA, FWS, NMFS, and MDMR requesting that the Corps conduct an EIS to evaluate the direct, indirect and cumulative impacts of

---

**2.** Because Casino World claimed that no dredging was necessary for the development of its site, it only applied for a permit under Section 10 of the Rivers and Harbors Act.

**3.** After the permit was granted, the Hancock County Port and Harbor Commission transferred it to Casino World, Inc. and the Mississippi Gaming Corporation. *See* CWAR at 117.

the project. The FWS, for example, expressed concern about potential impacts on marsh and tidal waters, wetlands, water quality, aquatic life, waterbottoms, upland forest habitat and cumulative habitat loss. *See* CCAR at 574. In addition, the MDMR expressed its opinion that "the project will ... have a much greater impact to the environment than has been disclosed or addressed by the applicant." CCAR at 727. After recalling the permit for further investigation after its initial issuance, the Corps once again rejected the requests for an EIS it received from the other agencies and issued its EA and FONSI, as well as the permit, on February 17, 1998.

### C. Royal D'Iberville

The third project at issue—the Royal D'Iberville casino project—applied for permits under Section 404 of the Clean Water Act and Section 10 of the Rivers and Harbors Act on September 25, 1997. The work proposed in navigable waters entailed a 462 foot by 120 foot floating casino barge, a concrete ramp and deck, a steel bulkhead, and four mooring caissons. *See* RDAR at 153. The proposed project also includes the upland construction of a porte cochere, a parking garage and parking lot, and a 300–room hotel. *See* RDAR at 153.

The Corps published a notice of the Royal D'Iberville application on March 23, 1998.[4] Two federal agencies—the FWS and the NMFS—and the Mississippi Department of Wildlife, Fisheries and Parks submitted comments opposing the issuance of the permit in the absence of the preparation of an EIS. *See* RDAR 218–23; 224, 229. The commenting agencies again raised concerns regarding the impacts of the project on aquatic habitat and water quality as well as the indirect and cumulative impacts of the project. The Corps nevertheless released a FONSI on October 6, 1998, determining that an EIS was not

warranted, and issued the permit the next day.

### D. Proposed Programmatic EIS

During the pendency of the permit applications, the EPA and the Department of the Interior also expressed concern regarding the cumulative casino development along the Mississippi coast to the Secretary of the Army. In response, Deputy Assistant Secretary of the Army Michael L. Davis issued a memorandum on March 4, 1998 instructing the Corps that "pending completion of a Programmatic Environmental Impact Statement (PEIS) for casino development in Harrison and Hancock counties, all pending and future casino permit applications in specified locations in said counties shall be held in abeyance." RDAR at 170. Despite the instructions of the memorandum, the Corps issued all of the permits in these matters. At the time of the May 19, 2000 motions hearing, the preliminary scoping of the PEIS had only just begun.

## II. DISCUSSION

Under the Administrative Procedure Act, a reviewing court may only set aside agency actions, findings or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious if an agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mutual,* 463 U.S. 29, 42, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Review of agency action "is to be based on the full administrative record that was before the [agency] at the time

---

4. The processing of the Royal D'Iberville application was delayed for reasons that are irrelevant to this matter.

[it] made [its] decision." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). In certain limited circumstances, however, a court may consider evidence not included in the administrative record that more fully explicates an agency's decision. *See Beach Communications, Inc. v. FCC,* 959 F.2d 975, 987 (D.C.Cir.1992); *Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989); *Carlton v, Babbitt,* 26 F.Supp.2d 102, 106–07 (D.D.C.1998). In these consolidated cases, the Court allowed plaintiffs to supplement the record on the basis of plaintiffs' representation that additional evidence was needed to identify those impacts that were not considered by the Corps at all and therefore were not reflected in the record. *See* Memorandum Opinion and Order of April 21, 2000. The Court, however, held that it would only use the evidence submitted by plaintiffs when it was necessary to identify unaddressed impacts. *See id.* at 5. After reviewing the full administrative record, the Court concludes that the issues raised by plaintiffs are reflected in the record in nearly every instance and that supplementation of the record ·is largely unnecessary. Except where otherwise indicated, the Court therefore has confined its review to the administrative record.

The Corps in these cases was required to act in compliance with the requirements of NEPA. As this Court has stated previously:

NEPA provides that a federal agency must prepare an environmental impact statement for "proposals for ... major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see also* 40 C.F.R. § 1502.3. When considering a proposed action under NEPA, an agency must first determine whether the action is one that normally requires or one that normally does not require an environmental impact statement. 40 C.F.R. § 1501.4(a). . . .

If an agency chooses not to prepare an environmental impact statement and does not invoke a categorical exclusion, the agency is required to prepare an environmental assessment to determine whether an environmental impact statement is necessary. 40 C.F.R. §§ 1501.3, 1501.4(a) & (b), 1508.9. Although not as detailed and thorough as an environmental impact statement, an environmental assessment requires the agency to carry out a preliminary environmental inquiry to determine whether the proposed action is a major activity having significant effects on the environment. If the agency determines that no environmental impact statement is required, it must report its decision in a "finding of no significant impact" ("FONSI"). 40 C.F.R. §§ 1501.4(e), 1508.13. If it determines that the proposed action does have a significant effect on the environment, it must then prepare an environmental impact statement. 40 C.F.R. § 1501.4.

*Anacostia Watershed Soc'y v. Babbitt,* 871 F.Supp. 475, 481–82 (D.D.C.1994).

In reviewing an agency decision to forego preparation of an EIS in favor of a FONSI, as is the case here, the reviewing court must apply a four-step analysis:

First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the problem, it must have taken a "hard look" at the problem in preparing the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Coalition on Sensible Transportation v. Dole,* 826 F.2d 60, 66–67 (D.C.Cir.1987).

There is a strong presumption in favor of upholding decisions of the Corps in view of its expertise in these complex areas and

the deferential standard of review. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375–78, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). Nonetheless, a reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision and then decide whether it was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 415–16, 91 S.Ct. 814. If the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made," its decision must be upheld. *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. at 105.

Plaintiffs claim that the assessments issued by the Corps failed to consider several aspects of the projects and that, to the extent the assessments did mention the impacts, they were so conclusory that they did not constitute any real consideration. In particular, plaintiffs contend that the environmental assessments issued by the Corps do not sufficiently address three different types of impacts of the casinos on the environment: (1) direct impacts, (2) indirect impacts, and (3) cumulative impacts. Plaintiffs further argue that the Corps was required to prepare an EIS because several characteristics of these projects make their environmental impacts "significant" as that term is defined by statute and regulations. The Court will address plaintiffs' arguments in turn.

### A. Direct Impacts

An agency's analysis under NEPA must account for all direct environmental impacts of the proposed action. 40 C.F.R. § 1501.2; 40 C.F.R. § 1508.8. Direct impacts encompass those impacts that are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).[5] Plaintiffs raise concerns about a number of impacts that might

result from the development of the casinos, most of which are applicable to all three sites.

### 1. Dredging

■ Plaintiffs first argue that the Corps failed to consider the impacts of dredging at the Casino World site even though such dredging is inevitable. Under the Mississippi statute authorizing gambling on floating vessels, a vessel must have draft of at least six feet. *See* MISS.CODE ANN. § 27–109–1. The Corps' own EA states that the average water depth of the Bay of St. Louis is only 4.4 feet. *See* CWAR at 1093. Plaintiffs therefore maintain that Casino World must dredge the bay if it is going to locate its barge on water deep enough to authorize gambling at the casino.

The Corps concedes that it did not consider the issue of dredging in its EA for the Casino World permit. The Corps contends, however, that it was not required to do so because Casino World stated in its permit application that the project would not require dredging. In addition, the permit issued by the Corps expressly prohibits any "dredging (including prop-washing), excavation or discharge of dredged or filled materials into the waters of St. Louis Bay...." CWAR at 1189. If dredging becomes necessary, the Corps represents that it would halt development of the site and revisit the entire permit. *See* Defendant's Motion at 29.

While it is hard for the Court to fathom how Casino World will comply with the statutory requirements without dredging in a body of water averaging under six feet in depth, the record does not demonstrate that the Corps failed to consider this impact. The record also does not demonstrate that the water depth at the Casino World site in particular is too shallow; plaintiffs only were able to cite the *average* water depth in the entire Bay of St. Louis. The Court therefore concludes that the

---

5. The regulations use the word "effects" instead of "impacts," but explicitly recognize that the two are interchangeable. *See* 40 C.F.R. § 1508.8. The Court will use the term "impacts" to simplify the discussion.

Corps was not arbitrary and capricious in its evaluation of this issue.[6]

## 2. Water Quality

■ Plaintiffs contend that the Corps did not evaluate the adverse impact that the casinos would have on the water quality of the St. Louis Bay or the Bay of Biloxi. In particular, plaintiffs argue that increase in sewage from the casinos would aggravate the already significant problems both bays have with wastewater pollution. Plaintiffs also maintain that the runoff from all three construction sites will contain toxic substances such as polynuclear aromatic hydrocarbons or PAHs.

In the EAs that the Corps conducted for each project, however, it did address these water quality issues. With regard to wastewater pollution, the Corps has taken a sufficient "hard look" at the water quality impacts of each project. For Circus Circus, the Corps noted that the applicant had agreed to construct a wastewater treatment plant for the area, which would eliminate a number of the area septic tanks that were the source of much of the pollution. *See* CCAR at 2397.[7] For Casino World, the local wastewater treatment plant agreed to take on the needed wastewater treatment. *See* CWAR at 1101. For Royal D'Iberville, the Corps analyzed the capacity of the relevant wastewater treatment plant and found that the plant had "ample capacity." RDAR at 309. While plaintiffs may disagree with the con-

clusions reached by the Corps on these issues, the Corps appears to have evaluated them adequately and decided that sufficient wastewater treatment would be available in each case.[8]

The Court also finds that the Corps sufficiently evaluated the potential impacts of runoff from the construction sites. Each of the EAs reflect that runoff would be run through retention basins and be filtered. *See* CCAR at 2398; CWAR at 1102; RDAR at 310. The EAs also indicate that the retention basins will operate in compliance with state permits. *See* CCAR at 2398; CWAR at 1102; RDAR at 310. Although plaintiffs may be correct that there will be toxic runoff despite these precautions, the Court will not question the agency's implicit assumption that regulated, filtered water should not have significant impacts on the environment. On the record presented, deference is due to the expertise of the agency on such matters. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. at 375–78, 109 S.Ct. 1851.

## 3. Wetlands

■ Plaintiffs argue that the Corps did not evaluate the impacts on the wetlands surrounding the construction sites as a result of runoff, sedimentation and placement of impervious surfaces adjacent to the wetlands that would reduce freshwater input. Agency commentors raised this issue for all three sites.[9] For example, the

---

**6.** Counsel for Casino World also argued at the motions hearing that it is not clear that six feet of water beneath the casino is necessary under the statute given the recent decision by the Supreme Court of Mississippi in *Concerned Citizens to Protect the Isles and Point, Inc. v. Mississippi Gaming Commission. See* 735 So.2d 368 (Miss.1999). The Court, however, does not read the *Mississippi Gaming Commission* case to eliminate the statutory requirement of six feet of water under the vessel; instead, the *Mississippi Gaming Commission* decision establishes only that the required six feet of depth may be obtained through dredging. *See id.* at 374–76.

**7.** While plaintiffs argue that the casino's legal obligation to build this plant has expired, the

Corps can reasonably rely on the casino's commitment to build it, especially since the permit is contingent upon the building of the facility. *See* CWAR at 2218.

**8.** Plaintiffs also argue that the growth resulting from the casinos would overtax the wastewater treatment facilities. Because these impacts are more properly viewed as indirect impacts of the casinos, the Court will address the argument along with other indirect impacts. *See infra* at 40–42.

**9.** The Corps urges the Court to ignore plaintiffs' arguments regarding the impacts on wetlands because they are based exclusively on the extra-record declarations of plaintiffs' experts. The Court, however, has not consid-

FWS expressed concern that impacts from the construction of Casino World "would cause direct and secondary impacts from runoff etc." on forested wetlands. CWAR at 541; *see also* CCAR at 573–74; RDAR at 220–22.

In the face of plaintiffs' arguments, the Corps maintains that it did consider the impacts that the three projects would have on wetlands when it conducted its EAs. A review of the EAs, however, does not reveal any consideration of this issue by the Corps. While the EAs state the Corps' conclusion that runoff into the wetlands would be treated at all sites, and while the projects did obtain wetlands permits from state authorities, the Corps never evaluated in the EAs the potential for the wetlands to be degraded by their proximity to the projects. The Corps therefore failed to take a "hard look" at this relevant concern that was raised by commentors.

### 4. Aquatic Habitat

■ Plaintiffs further maintain that the Corps failed to consider the impact of the projects on the non-vegetated waterbottoms of the bays. Nearly all commenting federal agencies noted the value of these waterbottoms as habitat. *See* CWAR at 613, 616, 819; CCAR at 574; RDAR at 222. The commenting agencies expressed concern that the waterbottoms would be destroyed by the dredging in the Royal D'Iberville and Circus Circus projects and hampered by the shading from the barges and structures of all three projects. Plaintiffs maintain that the Corps never addressed these concerns in their EAs.

The Corps admits that these issues were raised at the administrative level but argues that they were sufficiently addressed in the EAs. The Corps, however, has not demonstrated its analysis of the issue in the record. With regard to the reduction in productivity of ecosystems from shading, all three EAs state that the loss of productivity is "insignificant" and that the

Corps believes that fish and other organisms will move to other areas. *See* CCAR at 2393, CWAR at 1098; RDAR at 307. The Casino World EA also postulates that "shaded areas and hard structures resulting from the casino barge and piles will add habitat diversity to the shoreline and [will be] frequently utilized by fish and sessile organisms." CWAR at 1098; *see also* CCAR at 2393–94 (same); RDAR at 307 (same). The Corps does not provide the basis for any of these beliefs.

The EAs also lack any analysis of the impacts resulting from the dredging of the Royal D'Iberville and Circus Circus sites. Although the Corps points to record references that purport to analyze the significance of these impacts, the EAs again provide only conclusory statements. In particular, the EAs conducted for Royal D'Iberville and Circus Circus both recognize that benthic communities—communities of organisms located at the bottom of the bay—"will be destroyed," but neither EA analyzes the impacts of this destruction. *See* RDAR at 307; CCAR at 2394. The Corps therefore must provide further analysis of the impacts of dredging on the waterbottom habitat before it can conclude that the environmental impact is insignificant.

### 5. Intake of Larvae and Eggs

■ With regard to the Circus Circus project in particular, plaintiffs claim that the Corps did not consider the fact that the design of the casino will act as a "sump" and draw in larvae and eggs of aquatic species that breed in the wetlands. As an initial matter, the Corps concedes that it did not fully address this impact in its assessment but argues that it was not raised during the administrative process. The FWS, however, clearly noted in its comments that the casino could "act as a 'sump' and in effect trap certain aquatic life." CCAR at 575. The issue therefore

ered plaintiffs' extra-record declarations in evaluating the potential impacts of the casino projects on adjacent wetlands; rather, it has

relied exclusively on the comments submitted to the Corps by the federal agencies.

was before the Corps at the administrative level.

The Corps further argues that it gave adequate consideration to these impacts when it discussed impacts to shellfish and aquatic species during construction and stated that "[e]ntrapment and mortality of fish and other motile organisms in the casino basin and water intake is not expected to be significant." CCAR at 2393. The issue raised by the FWS, however, related to the entrapment of aquatic life by the "sump" action of the casino. The only portion of the EA that addresses this issue is the single conclusory statement quoted above that such an impact "is not expected to be significant." Because no analysis accompanied this statement, the Court cannot evaluate whether the Corps took a "hard look" at the problem or can make a convincing case for its statement.

Finally, the Corps argues that it was within its discretion to disregard this issue, as "[t]he NEPA process involves an almost endless series of judgment calls" regarding what potential impacts should be investigated. *Coalition on Sensible Transportation v. Dole*, 826 F.2d at 66. The problem is that the Corps appears to have made no judgment call based on sound analysis with respect to this issue, at least none that can be discerned from the record. The issue of the intake of larvae and eggs should have been addressed, fully considered and discussed. The FWS brought the concern to the Corps' attention as one of its primary concerns. It at least merited analysis.[10]

### 6. Aquifers

■ For the Royal D'Iberville project, plaintiffs claim that the Corps did not assess the increased use of water by the casino and the resulting draw on the area aquifers. Plaintiffs contend that the increased draw on the aquifers could lead to saltwater intrusion into the groundwater.

The Corps admits that it did not consider this issue. It contends, however, that it had no cause to consider it because no one raised it and because the City of D'Iberville represented that it could handle the water needs of the proposed project. *See* RDAR at 243. The Court agrees. Since no one raised the issue and in the absence of any indication to the contrary, the Corps should be allowed to rely on the city's representation that it could handle the increased demand.[11]

### 7. Scouring or Shoaling

■ Plaintiffs' final argument regarding direct impacts is that the Corps failed to consider whether the Royal D'Iberville casino will obstruct the Back Bay of Biloxi, resulting in scouring—the erosion of waterbottoms caused by an increased flow of water—or shoaling—sediment buildup making the waters shallow. In the EA for the Royal D'Iberville project, however, the Corps recognizes that the barge and wharf structure "may have a partial jetty effect on littoral transport, water currents and reflected wave energy." RDAR at 37. The EA further states that "because of the lack of any significant littoral drift at the site and limited wave height, the adverse impacts to the adjacent shoreline should be negligible." RDAR at 307. It therefore is apparent that the Corps did evaluate whether the Royal D'Iberville casino would disrupt the water flow in the bay and concluded that the lack of littoral drift—or current—would make any adverse impacts negligible. The Court will defer to the Corps' expertise.

---

10. In addition, because the Corps did not analyze the issue at all, plaintiffs' supplemental evidence is relevant to establish that one of the chief ecological functions of coastal wetlands is as breeding habitat for aquatic species. *See* Declaration of James R. Chambers ¶ 47. Any entrapment of eggs and larvae therefore would appear to be an important environmental impact for analysis.

11. Plaintiff also contends that secondary development will result in additional draws on the aquifer. This issue is more properly analyzed as a question related to indirect impacts, addressed below.

## B. Indirect Impacts

■ In assessing the environmental impacts of a federal action under NEPA, an agency also must consider "indirect impacts," which are defined as those impacts that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." *Id.* Plaintiffs contend that the Corps was required to analyze both the significant upland development adjacent to the casino barges and the inevitable secondary development that would result from the casinos.

With regard to the upland development, plaintiffs cite the Corps's own regulations, which state that the Corps must analyze the impacts of the entire project when the "environmental consequences of the larger project are essentially products of the Corps permit action." 33 C.F.R. § 325 App. B § 7(b). By way of example, the regulations state:

> [A] shipping terminal normally requires dredging, wharves, bulkheads, berthing areas and disposal of dredged material in order to function. Permits for such activities are normally considered sufficient Federal control and responsibility to warrant extending the scope of analysis to include upland portions of the facility.

*Id.* Plaintiffs contend that the hypothetical shipping terminal is analogous to the casinos at issue here.

Even in the face of the plain language of its own regulations, the Corps first maintains that it does not have to consider the upland impacts. The Corps relies primarily on two cases from 1980—both of which predate the regulations quoted above—to establish that the upland impacts are outside the scope of its authority. *See Save the Bay v. U.S. Army Corps of Engineers,* 610 F.2d 322 (5th Cir.1980); *Winnebago Tribe of Nebraska v. Ray,* 621 F.2d 269 (8th Cir.1980). In *Save the Bay,* the court found that the Corps' decision to grant a permit for the construction of an effluent pipeline in the context of the development of a multi-million dollar upland manufacturing plant did not have a sufficient nexus to the overall purpose of the project to render the permitting of the pipeline a "major federal action" within the meaning of NEPA. *See Save the Bay v. U.S. Army Corps of Engineers,* 610 F.2d at 326. In *Winnebago Tribe,* the court similarly found that the Corps' decision to grant a permit for a powerline crossing did not give the Corps legal authority over the entire development of the powerline and therefore did not render the permitting a "major federal action." *See Winnebago Tribe of Nebraska v. Ray,* 621 F.2d at 272.

Both cases involved situations very different from the permitting of the casinos at issue here. In *Save the Bay* and *Winnebago Tribe,* the agency was being asked to consider the impacts of a project over which its authority was limited to a minor or tangential part of the overall project. Here by contrast, the agency's jurisdiction encompasses the heart of the development projects—the permitting of the floating casinos themselves. All upland development results from and is entirely conditional on the permitted activity. Because the "environmental consequences of the larger project" therefore "are essentially products of the Corps permit action," 33 C.F.R. § 325 App. B § 7(b), the Court finds that the development here is akin to the shipping terminal example provided by the Corps' own regulations for which the scope of NEPA analysis was extended to the upland development. Quite clearly there is sufficient "Federal control and responsibility" to make the decisions of the Corps to grant a permit a "major federal action" under NEPA.

In the alternative, the Corps contends that it considered the impacts of the up-

land portions of the project in the EAs. While the Corps details a number of the possible upland impacts for each of these projects in the EAs, however, it provides no analysis of their significance. On the record before it, the Court cannot conclude that the Corps took a "hard look" at these impacts or made a "convincing case" for its finding. *See Coalition on Sensible Transportation v. Dole,* 826 F.2d at 66–67.

Even more problematic is the Corps' total lack of analysis of the growth-inducing effects of the casino projects. "Growth-inducing effects" are expressly included within the definition of "indirect impacts" in the regulations. *See* 40 C.F.R. § 1508.8(b). The Corps nevertheless contends that it was not required to analyze such impacts because it determined that they are "highly speculative and indefinite." *See Sierra Club v. Marsh,* 769 F.2d 868, 878 (1st Cir.1985). On this issue, the Corps is simply wrong.

Indirect impacts need only to be "reasonably foreseeable" to require an assessment of the environmental impact. *See* 40 C.F.R. § 1508.8(b). The administrative record in this case firmly establishes that increased growth in the area is the only reasonable prediction of what will occur if the casinos are built. First, in the EAs for the Casino World and Circus Circus projects, the Corps itself recognizes in a classic example of understatement that "[i]t is likely that this area may be developed in the future." *See* CWAR at 1107; CCAR at 2403. Moreover, the developers of these casinos themselves have trumpeted the supporting business development that will have to arise around the casinos in order to make their development plans attractive to the surrounding community. *See, e.g.,* CCAR at 146, 276. Finally, in calling for a Programmatic EIS, the Corps's own leadership has acknowledged that increased development resulting from the casinos is a concern that has been

raised by EPA and FWS. *See* RDAR at 170. Since the economic development of these areas is an announced goal and anticipated consequence of the casino projects, the Corps cannot claim that the prospect of secondary development is "highly speculative." The Corps therefore must consider the growth-inducing effects of the casinos.

### C. Cumulative Impacts

■ Plaintiffs further maintain that the Corps has utterly failed to consider the cumulative impacts of the numerous permitted casinos along the Mississippi coast. "Cumulative impacts" are those impacts "that result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or persons undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* When actions "will have cumulative or synergistic environmental impact upon a region" and "are pending concurrently" before an agency, "their environmental consequences must be considered together." *Kleppe v. Sierra Club,* 427 U.S. at 410, 96 S.Ct. 2718. "The purpose of this requirement is to prevent agencies from dividing one project into multiple individual actions 'each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *NRDC v. Hodel,* 865 F.2d 288, 297 (D.C.Cir.1988).

Because over twenty casinos have been permitted along the Mississippi coast and there is significant controversy over their cumulative impact, plaintiffs argue that this case is a classic example of a situation requiring a cumulative impacts analysis. The Corps responds that it has conducted a cumulative impacts analysis in each of the EAs that evaluate all reasonably foreseeable impacts.[12]

12. Circus Circus also argues that the Court should conclude that the Corps' analysis of cumulative impacts is adequate because the

Mississippi courts have found that the Mississippi permitting agencies adequately considered cumulative impacts. The Mississippi

Upon review of the EAs, it is apparent that, while the Corps dedicated nine or ten pages of each EA to cumulative impacts, the discussion provides no analysis at all. All three EAs merely recite the history of development along the Mississippi coast and then conclude that the cumulative direct impacts "have been minimal." *See, e.g.,* CCAR at 2408–09. There is no actual analysis, only that conclusory statement. "[C]onclusory remarks ... do not equip a decisionmaker to make an informed decision about alternative courses of action or a court to review the Secretary's reasoning." *See NRDC v. Hodel,* 865 F.2d at 298. Finally, at the stage of an environmental assessment where the agency is affirmatively finding that there are no significant impacts of the federal action with only summary investigation, some analysis is especially necessary to allow the Court to review the agency's finding. "[I]f a finding of no significant impact is made, the agency must be able to make a convincing case for its finding." *See Coalition on Sensible Transportation v. Dole,* 826 F.2d at 66–67.

---

courts, however, considered the actions of different agencies on the basis of different administrative records. While it is entirely possible that the Mississippi agencies made an adequate analysis of the cumulative impacts, that analysis is irrelevant for determining whether the Corps complied with its duties under NEPA (although the Mississippi analysis could inform the Corps' inquiry).

13. 40 C.F.R. § 1508.27 provides in relevant part:
    *Significantly* as used in NEPA requires considerations of both context and intensity:
    (a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality.... Both short- and long-term effects are relevant.
    (b) *Intensity.* This refers to the severity of the impact
    .... The following should be considered in evaluating intensity:
    (1) Impacts that may be both beneficial and adverse....
    (2) The degree to which the proposed action affects public health or safety.

## D. The Requirement of an EIS

Plaintiffs' final contention is that an EIS is required under the statute and regulations because the impacts are significant by definition. The regulations provide some guidance on when an impact is "significant." While it is not a checklist, the list of characteristics of a "significant" impact contains many of the characteristics apparent in this case. *See* 40 C.F.R. § 1508.27.[13] Plaintiffs focus upon two characteristics in particular:

(1) whether the action has impacts on "wetlands ... or ecologically critical areas," and

(2) whether the effects on the environment are "highly controversial." *Id.*

With regard to the first characteristic, the Corps initially maintains that the areas at issue are not "ecologically critical." As it applies to the St. Louis Bay, however, and thus to both Casino World and Circus Circus, this argument is belied by a review of the record.[14] Most significantly, the

---

(3) Unique characteristics of the area such as proximity to ... wetlands ... or ecologically critical areas.
(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.
(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.
(6) The degree to which the action may establish a precedent....
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.
(8) The degree to which the action may adversely affect [historic] districts, sites, highways, structures or objects....
(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat....
(10) Whether the action threatens a violation of Federal, State or local law or requirements imposed for the protection of the environment.

14. The Bay of Biloxi, where the proposed Royal D'Iberville casino would be built, is more developed and its ecological significance is not as clear from the record. *Com-*

Corps itself refers to the St. Louis Bay in the EAs as "one of the largest expanses of relatively undisturbed marsh within Mississippi." *See, e.g.,* CCAR at 1095. The record also contains numerous expert opinions regarding the ecological significance of the area. *See, e.g.,* CCAR at 575, 685, 688; CWAR at 541, 616. The St. Louis Bay therefore is an ecologically critical area, a characteristic that impels the preparation of an EIS.

The Corps also contends that the "highly controversial" nature of impacts resulting from its permitting decision regarding the casinos cannot justify the preparation of an EIS because the loudest voices could always force the preparation of an EIS by instigating a controversy. This, however, is not such a case. The effects of an action are "highly controversial" when there is "a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use." *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th Cir.1998) (quoting *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1335 (9th Cir. 1992)). In this case, three federal agencies and one state agency have all disputed the Corps evaluation of the environmental impacts of the casinos and pleaded with the Corps to prepare an EIS. The record also is replete with similar pleas from the public. Finally, the Corps' own leadership recognized that "[c]asino permits along the Mississippi Gulf coast has engendered considerable controversy and resulted in concerns from the leadership of both the [EPA] and the Department of the Interior." RDAR at 170–71. It therefore is clear that the permitting of these casinos is genuinely and extremely controversial.

Finally, the Court also notes that several of the other criteria for determining when an EIS is required appear to support the preparation in these cases. With the

proliferation of casinos along the Mississippi coast, the Corps may feel bound to the conclusions reached in the FONSIs issued in these cases, thereby allowing the FONSIs to serve as precedent for future casino projects. *See* 40 C.F.R. § 1508.27(b)(6). More importantly, the significant cumulative impacts of the multiple casino projects along the coast that the Court has discussed above warrant the preparation of an EIS. *See* 40 C.F.R. § 1508.27(b)(7); *see also supra* at 41–42. On this last criterion alone, it appears that an EIS is required. When viewed in conjunction with presence of the other factors and the numerous other potential environmental impacts described in this Opinion, the Court concludes that the Corps must prepare an EIS before issuing permits to the casinos. *See Sierra Club v. Marsh,* 769 F.2d 868, 870 (1st Cir.1985) ("If the record reveals such a substantial possibility [that an agency action could significantly affect the environment] with sufficient clarity, the agency's decision (not to prepare an EIS) violates NEPA").

## III. CONCLUSION

While NEPA is merely a procedural statute, it requires the agency to take a "hard look" at the environmental impacts of its action. Only then, with a full vetting of the environmental degradation that may result, will the agency and the public have the full picture of the environmental consequences of the agency's action. Here, the Corps' inadequate consideration of the direct, indirect and cumulative impacts of these three casino projects has provided less than the full picture. As the MDMR noted with regard to the Casino World project, there are "too many unanswered questions" raised by these projects. *See* CWAR at 646. A FONSI cannot be justified and an EIS is required. The Court will grant summary judgment in favor of plaintiffs.

---

*pare* RDAR at 218–21 (comments of FWS regarding the bay's ecological significance) *with* RDAR at 177 (comments of EPA that Royal D'Iberville was not within scope of

Programmatic EIS for relatively pristine, underdeveloped, or residential areas of bay systems).

An Order and Judgment consistent with this Opinion will be issued this same day.

SO ORDERED.

### ORDER AND JUDGMENT

Upon consideration of the parties' cross-motions for summary judgment, the submissions of defendant-intervenors, the administrative records and the arguments of counsel at the May 19, 2000 motions hearing in these matters, and for the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that plaintiffs' motion for summary judgment is GRANTED; it is

FURTHER ORDERED that defendant's motion for summary judgment is DENIED; it is

FURTHER ORDERED that defendant-intervenors' motions for summary judgment are DENIED; it is

DECLARED that defendant's actions in granting permits under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, for the development of the Casino World, Circus Circus and Royal D'Iberville casinos without the preparation of environmental impact statements violated the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations;

ORDERED that the defendant's actions in granting permits under Section 404 of the Clean Water Act, 33 U.S.C. § 1344, and Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, for the development of the Casino World, Circus Circus and Royal D'Iberville casinos are VACATED as arbitrary, capricious and not in accordance with law; and it is

FURTHER ORDERED that defendant shall immediately comply with the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*, and its implementing regulations by preparing environmental impact statements consistent with this Opinion.

FURTHER ORDERED that JUDGMENT is entered for plaintiffs; it is

FURTHER ORDERED that this Order and Judgment shall constitute a FINAL JUDGMENT in this case; and it is

FURTHER ORDERED that this case is dismissed with prejudice from the docket of this Court. This is a final appealable order. *See* Rule 4(a), Fed. R.App. P.

SO ORDERED.