McHUGH, Circuit Judge,
concurring:
I agree with the majority’s resolution of this case and I join most of its thoughtful analysis. But I write separately to discuss the Corps’ compliance with its obligations under NEPA because my view of this issue differs from that of the majority.
The Corps argues it fully complied with its obligations under NEPA when it reissued Nationwide Permit 12 (NWP 12) because it “thoroughly considered the individual and cumulative impacts of activities within its jurisdiction: discharges of dredged and fill material into waters of the United States under the terms of NWP 12.” As support for that position, the Corps argues its “determination to focus primarily on the environmental impacts of discharges of dredged and fill material associated with the category of utility lines, without delving into the particulars of how those utility lines would operate, was reasonable and fully consistent with [§ 404(e) of the CWA].” Thus, the Corps attempts to limit the scope of its NEPA analysis when reissuing NWP 12 to the consideration of only those environmental impacts occurring within jurisdictional waters as a result of the discharge of dredged and fill material. By doing so, the Corps conflates its obligations under NEPA with its obligations under § 404(e) of the CWA. But nothing in the text of NEPA allows the *1063 Corps to limit its analysis in such a manner.
When the Corps’ issuance of a permit under § 404(e) of the CWA constitutes a major federal action, as is the case with the issuance or reissuance of a nationwide permit, it must comply with the requirements of both the CWA and NEPA. The CWA permits the Corps to issue a nationwide permit if it “determines that the activities [authorized by the permit] are similar in nature, will only cause minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.” 33 U.S.C. § 1344(e)(1). When the Corps issues such permits, it must do so in accordance with guidelines issued by the EPA. Id.; see also id. § 1344(b)(1); 40 C.F.R. § 230. These CWA guidelines make clear that the Corps’ cumulative effects analysis under § 404(e) of the CWA is limited to an analysis of “the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material.” 40 C.F.R. § 230.11(g)(1). Thus, the Corps’ environmental analysis under the CWA may be properly limited to the aquatic impacts associated 'with the discharge of dredge and fill material.
In contrast, NEPA requires a significantly broader scope of analysis. The Council on Environmental Quality (CEQ) is tasked with interpreting NEPA and establishing regulations governing agencies’ responsibilities under the statute. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 354, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). CEQ regulations require federal agencies to consider all of the reasonably foreseeable direct, indirect, and cumulative effects of an agency’s action. 40 C.F.R. §§ 1508.7, 1508.8. Direct effects “are caused by the action and occur at the same time and place.” Id. § 1508.8(a). Indirect effects “are caused by the action and are later in time or farther removed in distance; but are still reasonably foreseeable.” Id. § 1508.8(b). Cumulative effects are “impaet[s] on the environment which result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.” Id. § 1508.7 (emphasis added). Thus, NEPA requires agencies to consider all of the reasonably foreseeable environmental effects caused by their major federal actions.
Courts have consistently held that the Corps’ NEPA obligations when issuing a § 404 dredge and fill permit — which constitutes a major federal action — extend beyond consideration of the effects of the discharge of dredged or fill material in jurisdictional waters. Indeed, courts routinely require the Corps to consider the direct, indirect, and cumulative effects— including nonaquatic effects — of the installations the Corps’ dredge and fill permits authorize. For example, in Hillsdale Environmental Loss Prevention, Inc. v. U.S. Army Corps of Engineers, we considered the validity of the Corps’ NEPA analysis when issuing a § 404 dredge and fill permit for the construction of an intermodal rail/truck terminal. 702 F.3d 1156, 1162-63 (10th Cir.2012). In its NEPA analysis, the Corps “considered both [the] direct and reasonably foreseeable indirect impacts to land use, air quality, noise, traffic, water quality, threatened and endangered species, and cultural resources” from the operation of the intermodal terminal. Id. at 1164. Far from limiting its analysis to the impact of dredged and fill material on jurisdictional waters, the Corps conducted a broad environmental assessment. And we upheld the Corps’ NEPA analysis because it had properly considered all of the *1064 environmental impacts of the intermodal terminal, not only the aquatic impacts associated with the discharge of dredged and fill material. Id. at 1172-77. As such, we have recognized that a NEPA environmental assessment requires the Corps to look beyond the effects occurring directly within its jurisdictional waters. See Utahns for Better Transp. v. U.S. Dep’t of Transp., 305 F.3d 1152, 1190-91 (10th Cir.2002) (recognizing that the CWA defines “cumulative impacts” more narrowly than does NEPA).
Other courts similarly require the Corps to look beyond the effects of the discharge of dredged and fill material. The Ninth Circuit’s analysis in Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113 (9th Cir.2005), is particularly instructive. In that case, the Corps issued a § 404 dredge and fill permit to a developer building a gated community near Phoenix. Id. at 1118-19. The development required Corps approval because several desert washes — which filled with water during the rainy season— intersected the proposed development site. Id. at 1118. The Corps prepared an environmental assessment and found the development would have no significant impact. Id. “In reaching this conclusion, the Corps examined only the washes rather than the entire project.” Id. On appeal, the Ninth Circuit considered whether “the Corps had improperly' constrained its NEPA analysis to the washes, rather than considering the development’s effect on the environment as a whole.” Id. at 1121. The court stated:
Although the Corps’ permitting authority is limited to those aspects of a development that directly affect jurisdictional waters, it has responsibility under NEPA to analyze all of the environmental consequences of a project. Put another way, while it is the development’s impact on jurisdictional waters that determines the scope of the Corps’ permitting authority, it is the impact of the permit on the environment at large that determines the Corps’ NEPA responsibility. The Corps’ responsibility under NEPA to' consider the environmental consequences of a permit extends even to environmental effects with no impact on jurisdictional waters at all.
Id. at 1122 (emphasis added). Thus, the Ninth Circuit held the Corps had improperly limited the scope of its NEPA analysis to the considerations relevant to issuing a permit under the CWA. Id. at 1123.
My understanding of the scope of the Corps’ responsibility under NEPA parallels that of the Ninth Circuit. The Corps may not limit its NEPA analysis to the consideration of the environmental effects of the discharge of dredged and fill material into jurisdictional waters, as would be appropriate under § 404(e) of the CWA. Rather, for NEPA purposes, the Corps is required to consider the direct, indirect, and cumulative effects reasonably foreseeable as a result of its permitting decision. This includes the environmental effects caused by the operation of the installations authorized by the Corps’ permitting decision. And this understanding of the Corps’ NEPA responsibilities has been universally adopted.[1] See, e.g., O’Reilly v. U.S. Army Corps of Eng’rs, 477 F.3d 225, 232-34 (5th Cir.2007) (holding Corps’ environmental assessment of proposed subdivision insufficient when it failed to properly evaluate adverse effects on area’s flood *1065 capacity due to increased pavement, increases in non-point source pollution from increased run-off, loss of habitat for non-aquatic wildlife, and adverse effects associated with increased vehicle traffic); Ocean Advocates v. U.S. Army Corps of Eng’rs, 402 F.3d 846, 868 (9th Cir.2005) (holding Corps had NEPA obligation to consider effects of increased oil tanker traffic and increased risk of oil spills when issuing § 404 permit for construction of oil refinery dock); Sierra Club v. Marsh, 769 F.2d 868, 877-78 (1st Cir.1985) (holding Corps’ environmental assessment insufficient for failure to consider future industrial development when issuing § 404 permit for construction of a port and causeway). See also Pres. Soc. of Charleston v. U.S. Army Corps of Eng’rs, No. 2:12-2942-RMG, 2013 WL 6488282, at *12 (D.S.C. Sept. 18, 2013) (rejecting Corps’ attempt “to justify what amounted to essentially a non-review of the proposed passenger terminal on the basis that its jurisdiction is limited to the portion of the project physically touching the navigable waters of the United States”); Wyo. Outdoor Council v. U.S. Army Corps of Eng’rs, 351 F.Supp.2d 1232, 1237, 1242 (D.Wyo.2005) (rejecting Corps’ argument that it was not obligated to consider cumulative impacts on non-wetland areas of regional permit authorizing dredge and fill associated with coalbed methane gas production); Friends of the Earth, Inc. v. U.S. Army Corps of Eng’rs, 109 F.Supp.2d 30, 37-41 (D.D.C.2000) (holding Corps was required to consider adverse effects associated with increased sewage, increased wastewater runoff, creation of large shaded areas on the aquatic habitat, creation of a “sump” that would trap aquatic wildlife, increased draw on area aquifers, and increased upland development when issuing § 404 permit for dredge and fill associated with construction of floating casino barges); Hoosier Envtl. Council, Inc. v. U.S. Army Corps of Eng’rs, 105 F.Supp.2d 953, 972-75 (S.D.Ind.2000) (upholding Corps’ environmental assessment when it properly considered the indirect effects of § 404 permit for construction of riverboat gambling facility, including construction of a hotel, pavilion, golf course, and parking facilities). Thus, when reissuing NWP 12, the Corps was required to consider all of the environmental effects reasonably foreseeable as a result of its permitting decision.
Moreover, I am convinced the failure to consider any environmental impacts beyond those associated with the discharge of dredged and fill material would have been, and in fact was, obvious to the Corps during the reissuance process so that no party was required to bring the defect to the Corps’ attention. See Dep’t of Transp. v. Public Citizen, 541 U.S. 752, 765, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004) (noting the flaws in an agency’s environmental assessment “might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action”). In its response to comments in the final notice on the reissuance of NWP 12, the Corps specifically acknowledged that “NEPA requires consideration of all environmental impacts, not only those to aquatic resources, so there may well be situations where aquatic impacts are minimal even though environmental impacts more generally are not.” Reissuanee of Nationwide Permits, 77 Fed.Reg. 10,184, 10,197 (Feb. 21, 2012). Given this explicit acknowledgement, the Corps cannot now take the contrary position that it satisfied its NEPA obligations when it focused exclusively on the aquatic impacts associated with the discharge of dredged and fill material. Accordingly, I would hold that the Corps’ NEPA analysis on the reissuance of NWP 12 was obviously flawed.
*1066 But the Corps attempted to address this deficiency by deferring portions of the required NEPA analysis to whatever agency took the lead for a given utility line project or to the district engineer at the verification stage. Id. (“These other environmental impacts would be addressed by the lead agency preparing the environmental impact statement. The district engineer will exercise discretionary authority to require an individual permit for any utility line activity that he or she determines does not meet the terms and conditions of NWP 12.”). For example, the environmental assessment for NWP 12 states:
Division and district engineers will conduct more detailed assessments for geographic areas that are determined to be potentially subject to more than minimal cumulative adverse effects. Division and district engineers have the authority to require individual permits in watersheds or other geographic areas where the cumulative adverse effects are determined to be more than minimal, or add conditions to the NWP either on a case-by-case or regional basis to require mitigation measures to ensure that the cumulative adverse effects are minimal.
U.S. Army Corps of Eng’rs, Decision Document Nationwide Permit 12 at 27 (2012) [hereinafter Decision Document].[2] The assessment also provides that the “pre-construction notification requirement allows district engineers to review proposed activities on a case-by-case basis to ensure that the individual and cumulative adverse effects of those activities on the aquatic environment are minimal.” Id. at 22. Thus, the Corps’ own environmental assessment undermines the argument it makes before us now — that it fully complied with its NEPA obligations at the time it reissued NWP 12.[3]
To be sure, accounting in advance for the broad range of possible impacts resulting from the wide variety of utility lines authorized under NWP 12 is a daunting task. But compliance with NEPA is not excused simply because compliance is difficult. And the problem was exacerbated by the Corps’ decision to draft a nationwide permit that defines utility lines expansively. Reissuance of Nationwide Permits, 77 Fed.Reg. at 10,271-72 (“A ‘utility line’ is defined as any pipe or pipeline for the transportation of any gaseous, liquid, liquescent, or slurry substance, for any purpose, and any cable, line, or wire for the transmission for any purpose of electrical energy, telephone, and telegraph messages, and radio and television communication.”). The Corps could have decreased the difficulty of its NEPA analysis by crafting a narrower set of permits, focusing on particular types of utility line projects.[4] By issuing narrower permits focusing on particular industrial processes, the Corps could better assess all of the environmental impacts of the processes themselves, as required by NEPA. Accordingly, I would hold the Corps impermissi-bly restricted the scope of its NEPA analysis when it considered only the effects of *1067 the discharge of dredged and fill material when reissuing NWP 12.
Nevertheless, I remain unconvinced that the Corps can permissibly defer any portion of its NEPA analysis to the verification stage. First, NEPA requires agencies to complete their environmental analysis at the point of agency action — in this case, the reissuance of NWP 12. See Citizens’ Comm. to Save Our Canyons v. Krueger, 513 F.3d 1169, 1178 (10th Cir.2008) (noting that NEPA requires agencies to “take a hard look at the environmental consequences before taking a major action” (emphasis added) (internal quotation marks omitted)); see also Ky. Riverkeeper, Inc. v. Rowlette, 714 F.3d 402, 409 (6th Cir.2013) (rejecting as “non-responsive” the Corps’ argument that district engineers would assess required NEPA elements in greater detail at the verification stage). It is impossible for an agency to have taken the “hard look” required by NEPA — and thereby have made a fully informed decision to undertake an action — if it knowingly defers portions of its analysis to a later date.
Second, in the context of nationwide permits, it may well be that, as happened here, there is no lead agency that will conduct an environmental assessment. And the NWP 12 environmental assessment expressly contemplates that “[i]ndi-vidual review of each activity authorized by an NWP will not normally be performed, except when pre-construction notification to the Corps is required or when an applicant requests verification that an activity complies “with an NWP.” Decision Document at 4. That is, unless an individual utility line project requires a pre-con-struction notification, parties are authorized to use NWP 12 without ever notifying the Corps. Thus, in the context of nationwide permits, it is often the case that no further environmental analysis is ever contemplated. As such, I would conclude the Corps was not permitted to defer any portion of its NEPA analysis to the verification stage. Rather, the agency was required to fully evaluate all of the required NEPA factors before reissuing NWP 12. That did not happen here.[5]
Nevertheless, I would affirm the district court because I conclude that Sierra Club’s argument that the Corps improperly deferred portions of its NEPA. analysis to the verification stage was not made to the agency during the reissuance process and is therefore waived. Sierra Club has pointed to no part of the record in which any commenter objected to the Corps’ decision to defer parts of its NEPA analysis to the district engineers or prospective lead agency. And although I would conclude that the Corps’ failure to consider the full environmental consequences of NWP 12 was an obvious deficiency in its environmental assessment, I cannot conclude that it would have been so obvious to the Corps that it could not defer portions of its analysis to the verification stage that commenters were not required to first raise the concern during the reissuance process. See Public Citizen, 541 U.S. at *1068 765, 124 S.Ct. 2204. The Corps has been issuing and reissuing NWP 12 for decades, with no party qbjecting to the deferral practice.
For these reasons, I concur.

. Although most of these decisions involve the issuance of individual permits, they address the scope of the Corps’ NEPA review, which is triggered by any permitting decision that qualifies as a major federal action. The issu-anee or reissuance of a nationwide permit is a major federal action that must comply independently with NEPA. See Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng’rs, 781 F.3d 1271, 1276 (11th Cir.2015).

. The Decision Document is available on the Corps’ website at http://www.usace.army.mil/ Portals/2/docs/civilworks/nwp/2012/NWP_12_ 2012.pdf.

. To my mind, the Corps' attempt at deferring portions of its cumulative effects analysis serves as a tacit admission that it did not conduct a full NEPA analysis at the time of reissuance.

.The Corps has issued industry-specific NWPs in other cases. See, e.g., Reissuance of Nationwide Permits, 77 Fed.Reg. 10,184, 10,274 (Feb. 21, 2012) (Nationwide Permit 21, Surface Coal Mining Activities); id. at 10,278 (Nationwide Permit 34, Cranberry Production Activities); id. at 10,281 (Nationwide Permit 49, Coal Remining Activities).

. CEQ regulations do allow partial deferral of NEPA analyses in certain prescribed circumstances. See Council on Envtl. Quality, Final Guidance for Effective Use of Programmatic NEPA Reviews (2014), available at https:// www.whitehouse.gov/sites/defaull/files/docs/ effective_use_ofLprogrammatic_nepa_ reviews_final_dec2014_searchable.pdf. But the CEQ's final guidance on programmatic NEPA reviews expressly states that such deferral is only appropriate when the initial NEPA review is subsequently supported by further review on a regional, local, or project specific basis. Id. at 26-29. Because I agree with the majority that the Corps is not required to conduct further NEPA analysis at the verification stage, the type of deferral contemplated by the CEQ’s guidance on programmatic NEPA reviews is unworkable in the nationwide permit context.